UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,                      CRIMINAL NO. 10-20078

       v.                                DISTRICT JUDGE VICTORIA A. ROBERTS

AMOS MOORE (D-1),            MAGISTRATE JUDGE VIRGINIA M. MORGAN

       Defendant.[1]
_____/

**REPORT AND RECOMMENDATION**
**TO GRANT DEFENDANT'S MOTION TO SUPPRESS (D/E #12)**

**I. Introduction**

This matter comes before the court on defendant Amos Moore's "Motion to Suppress" (D/E #12). Defendant seeks to suppress evidence arising out of a traffic stop of defendant by police officers from the City of Dearborn and agents of the Drug Enforcement Administration (DEA) on November 22, 2009. The government filed a response in opposition to the motion (D/E #15) and defendant filed a reply to that response (D/E #17). On June 8, 2010, this court held an evidentiary hearing and heard oral arguments with respect to the motion. Subsequently, the parties filed supplemental briefs (D/E #18, #23). For the reasons discussed below, the court

---

[1] Defendant Amos Moore was indicted along with another co-defendants: Henry Williams.

-1-

recommends that defendant's motion to suppress be **GRANTED** and that the evidence seized from defendant's truck, as well as his subsequent statements to law enforcement, be suppressed.

## II. Background

### A. Indictment

On February 11, 2010, defendant Moore and his co-defendant Williams were indicted on two counts (D/E #1). In Count One, defendant and Williams are charged with "21 U.S.C. §846 - Conspiracy to Possess with Intent to Distribute a Controlled Substance". In Count Two, defendant and Williams are charged with "21 U.S.C. §841(a) - Possession with Intent to Distribute a Controlled Substance" and "18 U.S.C. §2 - Aiding and Abetting". Both counts relate to an alleged possession, with intent to distribute, of 100 kilograms or more of marijuana on or about November 22, 2009.

### B. Motion to Suppress

On May 3, 2010, defendant Moore filed the motion to suppress pending before the court (D/E #12). In that motion, defendant argues that the warrantless stop of his truck on the basis of a traffic violation on November 22, 2009 was unlawful. According to defendant, while Michigan law requires that all required lights be illuminated after dark and the photograph provided by the Government indicates four lights on the area of the front bumper are unlit, none of the unlit lights are required by Michigan law (they are "after market" lights). Therefore, the fact that they may not have been working cannot form the basis for the stop.

On May 18, 2010, the government filed a response to defendant's motion to suppress (D/E #15). In that response, the government argues that the traffic stop was lawful because Michigan law requires semi-truck drivers to illuminate their turn signals after dark and, in this case, Dearborn Police officers observed defendant's truck and noticed that the left turn signal was not illuminated. According to the government, given those circumstances, the police had probable cause to stop defendant's truck because of defective equipment.

On May 25, 2010, defendant filed a reply brief in support of his motion to suppress (D/E #17). In that reply, defendant argues that, while the government now claims that the officers had probable cause to stop the truck because the turn signal was not illuminated, all the tangible evidence available indicates that the turn signal was lit and that the officers are fabricating a claim in order to justify the stop. Specifically, defendant notes that the government's own photographs support the defendant's claim that the lights were working. In addition, after the truck was towed to a storage lot, it was examined by an FDO investigator and that investigation has revealed that the lights in question are working. Defendant also argues that it was only after the basis for the stop was challenged that the government began to rely on the allegedly unilluminated turn signal and that the shifting theory of the reason for the stop significantly undermines the credibility of the officers making the claim.

**C. Evidentiary Hearing**

On June 8, 2010, this court held an evidentiary hearing and heard oral arguments. The first witness to testify was Brenton King, who is a police officer with the city of Dearborn. (Tr.

12-13) King testified that, on November 22, 2009, he was on patrol in a fully marked police car and that he conducted a traffic stop around 4:07 a.m. (Tr. 14) According to King:

> The basis for the stop, I was advised by Corporal Bazzi that they wanted the vehicle stopped because they believed that there was a large amount of narcotics inside, and he advised me that there was a turn signal or lamp on the driver's side front that was defective and not illuminated.

(Tr. 14) Bazzi also gave King an approximate location for the truck. (Tr. 23-24)

King further testified that the government's Exhibit 1 is a "photograph showing the passenger side lights are illuminated and the driver side lights are not" (Tr. 14-15) while the government's Exhibit 2 is a "similar photograph of the front of the tractor in question. This appears to be a dimmer photograph of the same truck, probably taken without the flash of the camera." (Tr. 16) However, King also stated that he was behind the truck when he first located it as well as during the entire traffic stop. (Tr. 24)

As stated in King's testimony, defendant was the driver of the truck and defendant exited the truck when asked to do so. (Tr. 17) At that point in the traffic stop, Corporal Bazzi and Officer Alkubani had arrived on the scene and were with King. (Tr. 18) King asserts that he heard Corporal Bazzi advise defendant of the equipment violations on the truck and that defendant appeared very nervous. (Tr. 18-19) According to King, defendant was sweating profusely even though it was November. (Tr. 19) King also testified that Corporal Bazzi spoke with defendant about documents that truck drivers are suppose to have, such as logbooks and manifests, but defendant only had incomplete documents. (Tr. 19)

King further testified that Corporal Bazzi asked for consent to search the truck, and defendant gave such consent. (Tr. 20) During the search, the police located a second person in the sleeping portion of the cab and, in King's view, that second person appeared to be under the influence of narcotics, alcohol, or both. (Tr. 19-20) The search also revealed three stacks of plywood in the truck's trailer. (Tr. 21) The stacks were hollowed below several sheets. The space inside two of the stacks were empty while the third, the one near the front of the trailer, contained marijuana. (Tr. 21) According to King, defendant was then arrested and Corporal Bazzi prepared the report regarding the incident. (Tr. 22, 26)

Madou Bazzi was the second witness to testify at the evidentiary hearing. (Tr. 28) He is Police Officer with the City of Dearborn assigned to a group enforcing drug laws. (Tr. 28) On November 22, 2009, he was working in a dual capacity, both as a Dearborn police officer and also as a member of a DEA Task Force. (Tr. 28) According to Bazzi, he was conducting surveillance of a semi tractor-trailer at the Michigan and Ohio border, around 1:45 a.m. on that date because he believed the occupants of that truck were returning from Arizona with a shipment of marijuana. (Tr. 29)

Bazzi also testified that he followed the truck from the Ohio border to the City of Dearborn, which comprised approximately two hours of surveillance. (Tr. 29) Bazzi further testified that, during the surveillance, he observed that the front driver's side turn signals of the truck were not functioning. (Tr. 29) Bazzi called ahead to have the truck stopped and it was stopped in the City of Dearborn. (Tr. 30)

According to Bazzi's testimony, he took part in traffic stop and spoke with defendant, who was the driver of the truck. (Tr. 30) Bazzi asserts that he advised defendant of the equipment violation and defendant said that he was unaware of it. (Tr. 31-32) Defendant also said that he was returning from Chicago with lumber, which Bazzi knew to be untrue as law enforcement had been tracking defendant's phone for some time and knew defendant had come from Arizona. (Tr. 32)

Bazzi testified that he requested a bill of lading or a manifest from defendant, but defendant was unable to produce either of those things. (Tr. 33) Bazzi also testified that he reviewed the driver's logbook and that the logbook indicated that there had been a trip to Gary, Indiana, either that night or the night before, and that defendant had been off duty for the previous month. (Tr. 34) Bazzi further testified that he asked defendant where defendant was going and defendant replied that he was going to the east side of Detroit to deliver lumber to a man named William. (Tr. 35) Defendant did not, however, have an address for the delivery. (Tr. 35) Bazzi also asked defendant to indicate where he had picked up the lumber from, but defendant could only say Chicago and he could not provide a business name or location from where he had gotten the lumber. (Tr. 35)

According to Bazzi, defendant consented to a search of the truck when asked and the police found marijuana in the truck. (Tr. 36-37) There were two types of marijuana found in a stack of plywood. (Tr. 38) Defendant was arrested and taken to the DEA's airport office. (Tr. 40) Bazzi then prepared a report with respect to the traffic stop. (Tr. 41) That report says that

truck was stopped for defective equipment, but it does not specify what equipment was defective. (Tr. 42)

During his testimony, Bazzi identified some of the government's exhibits. According to Bazzi, Government Exhibit 3 is a photo taken from the rearl of the trailer (Tr. 37-38), Government Exhibit 4 is a photograph of either the first or second empty stack of plywood (Tr. 38), Government Exhibit 5 is a photograph of the stack of plywood containing the contraband, (Tr. 38), and Government Exhibits 6-10 are photographs of the bags of marijuana (Tr. 39-40). In one photograph, Bazzi placed two circles around the signal lights that he asserts were not working on the night of the traffic stop. He identified the amber turn signal as the required but non-working light, although he first circled the after-market light. (Tr. 43-44; Defendant's Exhibit Q3)

The third witness to testify was Bruce Caldwell, another Dearborn police officer who was working on November 22, 2009 around 4:07 a.m. (Tr. 47-48) Caldwell testified that he was called to the scene of the traffic stop on I-94 in Dearborn and that he took the photographs entered as government exhibits. (Tr. 48-49) Caldwell also testified that, with respect to the Government Exhibit 1, he took the picture from an angle in order to prevent any reflection of the flash and to show that the driver's side blinker light was out. (Tr. 49) Taking a picture from a different angle may have required Caldwell to walk into traffic. (Tr. 50) Caldwell further testified that it appeared to him that the front driver's side turn signal was out. (Tr. 50)

The fourth witness to testify was Special Agent Bryan Satori of the DEA. (Tr. 53-54) Satori testified that he had participated in an investigation into marijuana trafficking that

involved defendant beginning on August 13, 2009. (Tr. 54-55) According to Satori, on that date, the DEA received a call from an individual saying he had information regarding defendant and that defendant was a truck driver who transports marijuana from Arizona to Michigan inside sheets of plywood. (Tr. 55) The DEA was also given a location alleged to be where defendant was delivering the marijuana. (Tr. 55) Satori identified the caller as a citizen who called the DEA "out of the blue." (Tr. 65)

Satori also testified that, on October 19, 2009, he received additional information regarding defendant from a DEA agent stationed in Missouri. (Tr. 57) Specifically, Satori asserts that the other DEA agent told him that several arrested individuals were indicating that defendant was transporting marijuana from Phoenix to Detroit. (Tr. 57-58) Those individuals also claimed to have robbed defendant of $480,000 on January 25, 2009. (Tr. 58)

Satori further testified that, in January of 2009, defendant was a passenger in a truck that was stopped by Oakland Police and which subsequently was discovered to have approximately $130,000 hidden in plywood sheets. (Tr. 58)

According to Satori, on the basis of the above information, he got a court order on November 2, 2009, to "ping" defendant's truck, *i.e.* use GPS tracking to follow defendant's phone. (Tr. 59) Satori also testified that, using that tracking device, he was able to discern that defendant was heading from Arizona to Detroit on or about November 21, 2009. (Tr. 61)

Satori did not take part in the traffic stop of defendant's truck (Tr. 61), but defendant was brought back to the DEA's office after the arrest (Tr. 62). There, according to Satori, defendant admitting to hauling something for someone named "Cowboy" that defendant had met in

-8-

Arizona. (Tr. 62) Defendant also spoke with Satori about the January 2009 robbery. (Tr. 63) Satori prepared a report which stated that the truck was stopped for a defective equipment violation, but it did not identify what equipment was defective. (Tr. 67-68) Satori also told the Assistant United States Attorney assigned to the case that the "defective equipment was the fact that all the lights on the front of the trailer with the exception of the turn signal had to be working." (Tr. 68) Satori testified that he received that information regarding the traffic stop from Bazzi. (Tr. 68)

The fifth witness to testify at the evidentiary hearing was David Gentry, who is an investigator with the Federal Defender's Office in Detroit. (Tr. 69) Gentry testified that, as part of his investigation, he located defendant's truck in Brownstone Township on May 18, 2010, and took pictures of the truck the next day. (Tr. 71) Gentry also testified that, by the time he located the truck, its batteries had gone dead from lack of use and he had to use jumper cables on the truck. (Tr. 72-73, 78) He did no other repairs. (Tr. 78) The interior of the truck had garbage in it and it did not appear to have been entered or that anyone had been inside side the stop. (Tr. 78-79) Gentry identified Defendant Exhibit H is a photograph of the truck (Tr. 73), Defendant Exhibit I is a closeup photograph of the side marker lens of the front turn signal, (Tr. 74), Defendant Exhibit J is a photograph of the truck's headlight and side marker light at an angle, (Tr. 74), Defendant Exhibits K and L are both photographs of the truck, with its lights off in first photograph and on in second (Tr. 75), and Defendant Exhibits M through P are more photographs of the truck. (Tr. 76-77) The driver's side lower horizontal lights are not operational, but those are not part of the safety requirements to illuminate the vehicle. (Tr. 90)

Gentry also testified that, at the time he examined the truck, all the required turn signal lights on the driver's side were operating, including the turn signal. (Tr. 79-82) Gentry further testified that, in looking at Government Exhibit 1, the front driver's side turn signal light could be on given the way photograph's angle and the way it reflects the illumination from the lights. (Tr. 86-90) Gentry also acknowledges that he was not present at traffic stop. (Tr. 80)

### D. Supplemental Briefs

Following the evidentiary hearing, the government submitted a supplemental brief (D/E #18). In that supplemental brief, the government argues that the police had probable cause to effectuate a traffic stop for defective equipment as Michigan law requires semi-truck drivers to illuminate their turn signals after dark. In particular, the government notes that, even if defendant's left turn signal was dimly lit, a mistake of fact would be acceptable because the stop was based on grounds that were objectively reasonable. The government also argues that the police had sufficient reasonable suspicion to support an investigatory detention in this case given the information they had received in the DEA's investigation of defendant.

Defendant also submitted a supplemental brief in support of his motion to suppress (D/E #23). In that supplemental brief, defendant argues that the court should recommend that defendant's motion be granted because the objective evidence indicates that the Dearborn police officers were fabricating their claim that defendant's turn signal was not illuminated. With respect to the government's other arguments, defendant asserts that the stop cannot be justified on the basis of the DEA's investigation because the officers did not base their actions on that

information. Defendant also argues that, by failing to raise this issue in its response, the government waived that claim and that any inquiry into either probable cause or reasonable suspicion requires that the government disclose information regarding its confidential sources, which as yet have not been provided to the court or defense counsel. Defendant further argues that the stop quickly escalated into an arrest of defendant and that his consent was not voluntary.

**III. Discussion**

Both traffic stops and searches of automobiles are within the scope of the Fourth Amendment, see, *e.g.*, Pennsylvania v. Labron, 518 U.S. 938, 940, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996); Delaware v. Prouse, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), and, accordingly, any evidence seized during an illegal traffic stop or search must be suppressed as "fruits of the poisonous tree," Wong Sun v. United States, 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); United States v. Blair, 524 F.3d 740, 748 (6th Cir. 2008). "It is well settled that in seeking the suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression." United States v. Rodriguez-Suazo, 346 F.3d 637, 643 (6th Cir. 2003) (quoting United States v. Feldman, 606 F.2d 679 n. 11 (6th Cir. 1979).

Here, defendant first argues that the initial traffic stop was improper while the government argues that the police had both probable cause to effectuate a traffic stop for defective equipment and reasonable suspicion of an ongoing crime to make a stop for a criminal

violation. As discussed below, this court rejects both of the government's arguments and finds that defendant has met his burden of proof.

### **A. Probable Cause**

A police officer legally may stop a car when he has probable cause to believe that a civil traffic violation has occurred. United States v. Sanford, 476 F.3d 391, 394 (6th Cir. 2007) (quoting Gaddis v. Redford Twp., 364 F.3d 763, 771 n. 6 (6th Cir. 2004). See also United States v. Davis, 430 F.3d 345, 352 (6th Cir. 2005) ("We have long held that so long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resultant stop is not unlawful and does not violate the Fourth Amendment." (internal quotation marks and citation omitted).

Probable cause is a reasonable ground for belief supported by less than *prima facie* proof but more than mere suspicion. United States v. Jackson, 470 F.3d 299, 306 (6th Cir. 2006) (quoting United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990)). The requirements of probable cause are satisfied "where 'the facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." Brinegar v. United States, 338 U.S. 160, 175-76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) (quoting Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925)).

When a traffic stop is supported by probable cause, an officer's subjective intent is irrelevant. Whren v. United States, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).

As stated by the Sixth Circuit, "police officers [may] stop vehicles for any infraction, no matter how slight, even if the officer's real purpose was a hope that narcotics or other contraband would be found as a result of the stop." United States v. Blair, 524 F.3d 740, 748 (6th Cir. 2008) (quoting United States v. Mesa, 62 F.3d 159, 162 (6th Cir. 1995).

      In this case, the government specifically argues that the police had probable cause to effectuate a traffic stop for defective equipment as Michigan law requires semi-truck drivers to illuminate their turn signals after dark. However, the reports complied after the traffic stop and arrest fail to provide support for that position. Both the Dearborn Police report and the DEA report made with respect to the traffic stop merely provide that the truck was stopped for defective equipment and they do not identify the specific defective equipment. (Tr. 41-42, 67-68; Attachment #1 to Defendant's Motion to Suppress; Attachment #3 to Defendant's Reply Brief) This court finds that, based on the evidence, there was no such defective equipment. The turn signals were on and the non-working lights were not required by law.

      Additionally, it appears that the DEA may have been told by the Dearborn Police that all the required lights were working. Special Agent Satori testified that he told the Assistant United States Attorney assigned to the case that the reason the truck was stopped was because all the lights on the front of the truck, with the exception of the turn signal, had to be working and they were not all working. (Tr. 68) Satori also testified that he received that information regarding the traffic stop from Bazzi (Tr. 68) and the AUSA relied upon that basis for the traffic stop during discovery (Attachments #1 and #2 to Defendant's Reply Brief). This, however, was not Michigan law as testified to at the hearing by the police officers and others.

During the evidentiary hearing, Bazzi did testify that he observed that the front driver's side turn signals of the tractor were not functioning and that he then called ahead to have the truck stopped. (Tr. 29-30) However, the remaining evidence in the record contradicts that testimony; the turn signal lights were working. This court finds Bazzi stating that they were not working to be inaccurate. For example, the photographs heavily relied upon by the government actually provide support for defendant's position. (Government Exhibits 1 and 2) Officer Caldwell took pictures of the front driver's side turn signal at the scene, but the angle he used for the photograph from was practically the worst possible angle to demonstrate that the turn signal light was out. The photographs clearly show that the lower lights were not working, but those are not the required lights. Moreover, to the extent the photographs from the scene do capture the front driver's side turn signal, the photographs demonstrate that the turn signal light was working. While it is difficult to see the front driver's side turn signal given the angle of the photograph and the position of the turn signal behind the headlight, amber illumination can clearly be seen coming from the turn signal. Likewise, the photographs also demonstrate the light from the turn signal being reflected on the post on the right of the truck. Overall, the photographs are from a bad angle, but they are sufficient to convey that the front driver's side turn signal light was operational on the night of the traffic stop.

Defendant's position that the front driver's side turn signal light was operational on the night of the traffic stop is also supported by Gentry's investigation following the arrest. Gentry specifically testified that, while he did not examine defendant's truck until May of 2010, all the lights on the driver's side were operating, including the front driver's side turn signal, at the time

he examined the truck  (Tr. 79-80)  Gentry's testimony is confirmed by the photographs he took. (Defendant's Exhibits H-P).  This court would also note that the lights were working in May of 2010 even though the truck's batteries had gone dead from lack of use and Gentry had to use jumper cables on the truck.  (Tr. 72-73, 78)  Gentry was not present the night of the traffic stop, but his testimony and the accompanying evidence provides significant support for defendant's position.

The above evidence, as well this court's opportunity to observe the demeanor and credibility of witnesses, leads this court to find that defendant's truck was not stopped because of a defective front driver's side turn signal.  Moreover, while there were some unilluminated lights on the front of defendant's truck, those unlit lights are not required under Michigan law and they cannot form the basis for a stop.  See M.C.L. § 257.684-699.[2]  Therefore, this court finds that the Dearborn Police officers did not have probable cause to stop defendant's truck for a civil traffic infraction.

### B, Reasonable Suspicion

The government also argued late at the evidentiary hearing and in its supplemental brief that the traffic stop was lawful because the Dearborn Police had sufficient reasonable suspicion to support an investigatory detention given the information they had received in the DEA's investigation.  However, this court recommends that the argument be deemed waived because the government never timely asserted any such argument prior to the hearing or in its response to

---

[2]To extent law enforcement officers discussed Dearborn City Ordinance 18-796, this court would note that the city ordinance merely adopts the state of Michigan's Motor Vehicle Code.

defendant's Motion to Suppress. Moreover, as described below, to the extent the DEA's investigation was addressed at the evidentiary hearing, that testimony undercuts the government's position and it should be rejected.

As first described in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), a warrantless encounter may be countenanced under the Fourth Amendment if an officer has reasonable suspicion that criminal activity may be afoot. United States v. Campbell, 549 F.3d 364, 370 -371 (6th Cir. 2008). Reasonable suspicion "requires more than a mere hunch, but is satisfied by a likelihood of criminal activity less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard. If an officer possesses a particularized and objective basis for suspecting the particular person of criminal activity based on specific and articulable facts, he may conduct a Terry stop." Dorsey v. Barber, 517 F.3d 389, 395 (6th Cir. 2008) (quoting Smoak v. Hall, 460 F.3d 768, 778-79 (6th Cir. 2006)). A Terry stop must be supported by specific and articulable facts that would "warrant a man of reasonable caution in the belief that the action taken was appropriate." Terry, 392 U.S. at 21-22 (citations omitted). In other words, "[t]he officer must be able to articulate more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity." Illinois v. Wardlow, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (citing Terry, 392 U.S. at 27, 88 S.Ct. 1868). A court considers the totality of the circumstances to determine the validity of a Terry stop. Blair, 524 F.3d at 750. During a Terry stop, the officer may conduct a brief traffic stop for investigative purposes and make reasonable inquiries to confirm or dispel his suspicions. United States v. Butler, 223 F.3d 368, 374 (6th Cir. 2000).

Here, while Corporal Bazzi alluded to being part of a DEA Task Force (Tr. 28), he also expressly testified that he ordered the truck to be stopped because of defective equipment (Tr. 29-30). Similarly, while Special Agent Satori testified with respect to the investigation involving defendant (Tr. 54-61), he also testified that he had no part in the traffic stop (Tr. 61) and that Corporal Bazzi informed him that the truck was stopped because "all the lights on the front of the truck, with the exception of the turn signal, had to be working" and they were not all working on defendant's truck (Tr. 68).

The reasonable suspicion for a <u>Terry</u> stop can be based on the collective knowledge of law enforcement officers. <u>See</u>, *e.g.*, <u>United States v. Braggs</u>, 23 F.3d 1047, 1049 (6th Cir. 1994) ("Reasonable suspicion can be based upon police officers' own observations or upon the collective knowledge of other officers."). However, given the testimony in this case, the traffic stop here was not based on collective knowledge derived from the DEA's investigation. Instead, the stop was made solely on the basis of an alleged civil traffic infraction. Therefore, to the extent the district court even considers the government's reasonable suspicion argument, that argument should be rejected.

**C. Suppression**

In light of the above evidence and this court's rejection of the two grounds offered by the government as the basis for the traffic stop, this court finds that defendant has met his burden of demonstrating that the traffic stop was unlawful at its inception. Accordingly, this court also recommends that defendant's motion to suppress be granted and that the evidence seized from defendant's truck, as well as his subsequent statements be suppressed. <u>See</u>, *e.g.*, <u>United States v.</u>

Blair, 524 F.3d 740, 748 (6th Cir. 2008) (holding that a traffic stop is a seizure and that "any evidence seized during an illegal traffic stop must be suppressed as 'fruits of the poisonous tree.'" (internal quotation and citations omitted).

**IV. Conclusion**

For the reasons discussed above, this court recommends that defendant Moore's motion to suppress (D/E #12) be **GRANTED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. Thomas v. Arn, 474 U.S. 140 (1985); Howard v. Secretary of HHS, 932 F.2d 505, 508 (6th Cir. 1991); United States v. Walters, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. Willis v. Secretary of HHS, 931 F.2d 390, 401 (6th Cir. 1991); Smith v. Detroit Fed'n of Teachers Local 231, 829 F.2d 1370, 1373 (6th Cir. 1987).

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court. The response shall address each issue contained within the objections specifically and in the same order raised.

                                S/Virginia M. Morgan
                                Virginia M. Morgan
                                United States Magistrate Judge

Dated: July 14, 2010

---

**PROOF OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record via the Court's ECF System and/or U. S. Mail on July 14, 2010.

                                s/Jane Johnson
                                Case Manager to
                                Magistrate Judge Virginia M. Morgan